Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 6240 | **DATE** | 9/27/2011 |
| **CASE TITLE** | Mark Groszek vs. Village of Calumet Park *et al.* | | |

**DOCKET ENTRY TEXT**

Defendants' motion for summary judgment is granted.

■ [ For further details see text below.]

Docketing to mail notices.
*Mail AO 450 form.

## STATEMENT

    This is an employment discrimination case. Plaintiff Mark Groszek, a police officer, alleges that his employer, the Village of Calumet Park and its Chief of Police Mark A. Davis, engaged in race, age, disability, and retaliatory discrimination by constructively discharging him in October 2008. Before the Court is defendants' summary judgment motion. For the reasons set forth below, the motion is granted.

    **Facts.** Groszek worked as a police officer for the Village for many years. In 2002, the Village hired Mark Davis as a new police chief. Groszek believes that Davis, who is African American, came into the job with an intention to get rid of older white police officers such as Groszek. Davis allegedly made several remarks early in his tenure evidencing this intention. For example, Davis allegedly stated in 2002 soon after being hired: "All you white cops have never done police work. You guys got away with a bunch of you know what, you know what I'm talking about." (DF 9.) At that time all four police sergeants were white.

    Over the next six years, Groszek worked under Davis and his assistant chief, a white woman named Susan Rockett who began working for the Village at the same time as Davis. During this period, Davis and Rockett criticized Groszek a number of times about alleged failures in performance. *See* DF 18, 19, 20, 25, 26. It is fair to say that tension and conflict existed between Groszek and his supervisors, especially the assistant chief Rockett. But Davis did not seek to fire Groszek for these alleged shortcomings.

    The incident that led to Groszek's resignation -- or, from his point of view, his constructive discharge -- began in August 2007. During a five-week vacation, Groszek was driving home from a friend's house when he started having difficulty breathing and felt dizzy. He feared he was having a heart attack. (DF 47; Cmplt. ¶11.) When he got home, his mother drove him to the emergency room. The doctor there concluded he had a panic attack likely triggered by his decision to stop taking Lorazepam, a drug another doctor had prescribed for an earlier back injury. (PF 4.) Groszek started seeing a psychiatrist named Dr. Czarnkowski who diagnosed him with panic disorder without agoraphobia. (DF 49.) On August 18, 2007, Dr. Czarnkowski wrote a note stating that Groszek needed to be "relieved from his duties for a period of 1 month" to allow his medication to take effect. (DF 50.) The note was delivered to Chief Davis. On August

22nd, Davis wrote a memo back to Groszek, stating: "Due to the nature of your employment as a police officer and the current diagnosis and liability of the Calumet Park Police Department I am ordering you to refrain from any type of police action and to turn over your weapon, badge and identification card immediately." (DF 51.) The memo also stated: "Your medical condition will require you to remain in this status until you have been medically cleared to return to duty." (*Id.*)

At this point, the parties dispute what happened -- or rather, what should have happened. Davis expected that after the one month period expired Groszek would notify the police department if he needed more time for his medical condition. Groszek, on the other hand, believed he did not need to come to work or otherwise communicate with his employer until his doctor cleared him to return to duty. When the 30-day period ended, Davis claims he made several attempts to contact Groszek, personally calling him and leaving a voicemail, then having his clerk also leave a voicemail, and finally having a police officer drive by his house. (DF 55.) According to Davis, Groszek never responded. Groszek denies such attempts were made.

According to Groszek, on August 22nd when Davis wrote the memo asking him to turn over his weapon and badge, Davis also called Groszek and told him he could "no longer be [a police officer] anymore ever again." (PF 13.) (Davis denies making the statement.) Groszek thus believes that even before he failed to return to work after the 30-day period Davis had already decided to fire him, a decision allegedly based on animus to the disabled. As for Groszek's decision not to check in with his employer at the end of the 30-day period, Groszek points out that the work schedule posted in the radio room during this time indicated that he was on extended sick leave from September 16, 2007 through October 13, 2007 and then from October 14, 2007 through November 10, 2007. (PF 14.) The schedule was signed and approved by Davis. (*Id.*) Davis testified that the clerk marks an employee's schedule "extended sick" for the entire period covered by the schedule rather than try to figure out when the person is coming back to work even if the person is only supposed to be gone a short period. (Davis Dep. 73.) It is not clear whether Groszek knew about the schedule at the time he was out or whether it is something he learned later in discovery in this case.

On October 16, 2007, Davis wrote Groszek a memo stating that he had received no contact from Groszek since September 18 (the date his 30-day medical leave expired) and that Groszek was therefore deemed not to have appeared for work for 16 scheduled days of work, which violated a company rule of not missing more than three consecutive work days without notifying the Village. (DF 57.) It is undisputed that Groszek did not speak with anyone at the Calumet Park Police Department between August 22nd and October 16th. (DF 56.).

On October 25, 2007, after receiving the Davis memo, Groszek went to Dr. Czarnkowski who wrote a note that Groszek should remain off work for another two weeks because "a stressful work environment can potentially worsen his anxiety symptoms." (DF 58.) The note was given to the police department the same day. On October 29, 2007, Groszek was served with a letter indicating that charges were being brought against him before the Board of Fire and Police Commissioners. (PF 16.) Groszek was assigned to administrative leave with pay. Davis then ordered Groszek to submit to a fitness for duty evaluation on November 12, 2007, which Groszek did. (PF 17.) Davis received the report on November 27th. It stated that Groszek could return to work, although it contained several critical remarks, stating for example that Groszek had "no intention of functioning as a team player in his supervisory position," a conclusion which Davis found troubling. (DF 63.) The report was not given to Groszek at this time.

On January 7, 2008, Groszek filed a charge of discrimination with the EEOC. (DF 64.) On May 20, 2008, a notice of hearing was sent to Groszek regarding the charges that he missed work. A hearing was held but Groszek remained silent and offered no argument. As result, on June 3rd, Groszek was terminated. (DF 66.) On June 3rd, Groszek's union attorney filed a grievance regarding this termination. On July 9th, Groszek's attorney filed a second EEOC charge. (DF 68.) With these claims pending, Groszek, his Union, and the Village entered into a settlement agreement to resolve "all of [the parties'] differences regarding the employment status of Groszek." (DF 69.) Under the settlement agreement, Groszek agreed to apply for retirement in October 2008, and the Village agreed to pay back pay from November 9 2007 until October 20,

| STATEMENT |
|---|

2008 (approximately $88,000), to remove from Groszek's personnel file all evidence regarding his termination, and to pay health care benefits for both Groszek and his daughter. (DF 69; PF 24; Ex. 56.) The agreement also provided that Groszek would receive a copy of his fitness for duty evaluation within 2 weeks of the execution of the agreement. (PF 24.)

In this Court, Groszek filed a five-count complaint, asserting a claim for race discrimination under Title VII (Count I); a claim for disability discrimination under the Americans with Disabilities Act (Count II); a claim for age discrimination under the Age Discrimination in Employment Act (Count IV); a claim for retaliation under Title VII (Count IV); and a common law fraudulent misrepresentation claim (Count V).

**Analysis.** The parties in their briefs focus mostly on the four federal discrimination counts, leaving the state law fraud claim to be addressed briefly at the end. This is somewhat surprising. First, as Groszek candidly states in his complaint, the terms of the settlement agreement, if enforceable, would bar any claim "arising out of his discrimination charges." (Cmplt. ¶ 17.) Second, all four federal discrimination claims rest on the theory that the adverse action in this case is a "constructive discharge," which he identifies as his decision to enter into a settlement agreement. *See* Cmplt. Count I (¶ 20); Count II (¶ 21); Count III (¶ 20); Count IV (¶ 19). His constructive discharge theory thus rests on the claim that he did not voluntarily enter into that agreement but did so only because of the alleged fraud in not disclosing the results of the fitness evaluation. Based on these two points, it would appear that the four discrimination claims can go forward only if his fraud claim is successful. For this reason we will address this claim first.

Groszek alleges that the failure to give him the report made him believe the results were negative. (Cmplt. p. 9 "giving Plaintiff the impression that he had been found unfit for duty".) This impression in turn allegedly induced him to enter into the settlement agreement. (Pl. Resp. 14.)

The parties agree that under Illinois law a plaintiff must satisfy five elements to bring a fraudulent misrepresentation claim. *See* Defs. Mem. at 14 (citing cases). Defendants argue that Groszek cannot (among other things) meet the first element requiring a false statement of material fact. It is undisputed that neither Davis nor anyone else ever made any representation one way or another about the report or its conclusions. *See* DF 70. Conceding this point, Groszek argues that Davis created a misrepresentation by failing to disclose the results -- in other words, he had an affirmative duty to disclose the results.

We are not persuaded by this argument. For one thing, Groszek fails to cite to any case suggesting a duty to speak exists under facts similar to this case. The one case he does rely on -- *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 435 (7th Cir. 1996) -- does not provide support because the Seventh Circuit there affirmed that the party had no duty to speak and affirmed that the district court properly granted summary judgment. Groszek assumes without explanation that Chief Davis had a duty to speak. But why? Groszek does not point to any facts suggesting Davis had an obligation to disclose the results.

Groszek tries to support his argument by pointing out that the settlement agreement contains an explicit provision requiring the Village to give Groszek a copy of the report within two weeks after the agreement was entered into. Rather than support Groszek's argument, this fact strongly cuts against it. The inclusion of this provision shows that the parties were aware of the report and negotiated a clause dealing with how it should be handled. Groszek was represented by counsel. Groszek in his response brief states that the parties at the time were "engaged in long, drawn-out negotiations and hearings regarded plaintiff's proposed termination." (Pl. Resp. at 18.) In these circumstances, Groszek was not an unsophisticated party being duped into entering into an agreement. If Groszek felt the results of the report were essential to his decision whether to settle his claims, he and his attorneys had a number of options. They could have refused to sign the agreement until they received a copy of it. They could have asked the Village to make a representation in writing about the results. That they chose to proceed as they did, by getting the report *after* they signed the agreement, belies the claim that this report was material to their decision. Moreover, as defendants point out, it is not clear why the failure to disclose the results led Groszek to assume that the results were bad for him. Wouldn't the opposite assumption be more reasonable? Under Groszek's theory of the case, the defendants were pretextually coming up with false grounds to fire him. If the report held Groszek was unfit, why would

| STATEMENT |
|---|

they not disclose it to bolster their decision? For all the above reasons, we grant summary judgment to defendants on the fraud claim.

As noted above, given Groszek's admission in his complaint that the settlement agreement, if enforceable, would bar the discrimination claims, it would seem that we could simply enter judgment on the remaining claims without further analysis. However, because the parties did not brief this issue, we will proceed to examine defendants' other arguments for granting judgment on the four discrimination claims.

We will first evaluate the race, age, and disability discrimination claims together because they are all evaluated under the same standard. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003) As the parties agree in their briefs, Groszek has the burden of establishing a prima facie case and may do so by using either the direct or indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). For his age and race discrimination claims, Groszek relies on both methods. For his disability claim, Groszek relies only on the indirect method.

We first consider the indirect method. A plaintiff must demonstrate four requirements: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly-situated employee outside his protected class was treated more favorably. *Farr v. St. Francis Hosp. and Health Centers*, 570 F.3d 829, 833 (7th Cir. 2009). Groszek argues that he was in a protected category because he is white with an African American supervisor and because he was over 40; that his performance met the Village's legitimate expectations because, although he was cited for various disciplinary infractions over the six-year period, they were not the reason he was fired; that an adverse termination occurred because he was constructively discharged in October 2008 when he entered the settlement agreement; and that he was treated less favorably than non-white and younger employees. Although defendants raise legitimate arguments as to whether Groszek can meet the first three requirements, they argue strongly that he cannot meet the fourth requirement of pointing to another similarly situated employee outside the protected classes. We agree.

Groszek argues that younger and African-American employees were allowed to return to work after sick leave and also were allowed to work light duty. (Pl. Resp. at 8.) He specifically points to the case of Officers Garretson and Brooks who in 2004 were allegedly allowed to work light duty instead of taking sick time for medical issues. *See* DF 15. The evidence for what happened in these two cases comes solely from Groszek's own vague recollection in his deposition six years later. (Groszek Dep. at 56-57.) He gives little detail, stating that the two officers "didn't have to stay off of work and use their sick time[;] they could come to work and sit in the radio room and get paid their hours." (*Id.* at 56.) But these two men are not similarly situated. As an initial matter, no evidence establishes that either man was younger, and Officer Garretson is white. *Id.* at 57. Therefore, as defendants correctly point out, even if these two men were treated more favorably, the fact that one them was white and the other black cuts against Groszek's claim. Moreover, these two cases concerned a different issue of whether they were allowed to work light duty. In contrast here, the issue is whether Groszek properly kept in touch with his employer at the end of the 30-day period and whether he failed to return to work. Groszek has not identified any employee who fell in this category. *See* DF 71 ("Groszek has no knowledge of any other employees who failed to return to work after taking sick leave.") Finally, regarding his disability claim, Groszek does not even attempt to point to a similarly situated individual.

For the above reasons, Groszek has failed to meet his burden of establishing a prima facie case under the indirect method for the race, age, and disability claims. As noted above, because the indirect method is the only avenue of recovery relied upon for the disability discrimination claim, summary judgment is granted on that claim. We therefore will not analyze the additional arguments for dismissing that claim such as defendants' argument that Groszek's "manageable panic disorder" fails to meet the ADA's definition of a disability which substantially limits a major life activity.

We next consider Groszek's argument under the direct method. Under this method, he "must offer either direct evidence that acknowledges discriminatory animus on the part of the employer or circumstantial

evidence which establishes discriminatory motive through a longer chain of inferences." *Grigsby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010). The two general types of circumstantial evidence are: "(1) ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent and (2) evidence of systemically better treatment of employees outside the protected class." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010) (quoting *Coffman,* 578 F.3d at 563).

As evidence of racial animus, Groszek relies on four statements allegedly made by Chief Davis: (1) in 2002 or 2003, a village trustee and a few public works employees heard Davis say in a parking garage: "All those senior white Mfers, they're going to go. We're going to get rid of all of them" (PF 26); (2) in 2002, Groszek himself heard Davis refer to white male officers at "those guys" or "those people" (PF 25); (3) in 2002, Groszek heard Davis say: "All you white cops have never done police work. You guys just got away with a whole bunch of you know what, you know what I'm talking about." (PF 25); and (4) other officers on numerous occasions were told "if they wanted to keep their jobs they better not be seen talking to 'those guys'" (PF 27).

Groszek's reliance on these statements suffers from several significant problems. First, several of the statements are hearsay and may not be considered, specifically the first and fourth statements. In general, Groszek's case relies almost exclusively on his own testimony, and his attorney for some reason never sought to depose the other participants who could have provided first-hand testimony. For example, the first statement was allegedly heard by both a trustee and by several public works employees standing nearby. But Groszek offered no evidence from these individuals. The second problem, related to the first, is vagueness. Several comments, such as "those people," are ambiguous, and it is hard to know for sure what is being referred to. Context is important. The hearsay rule is based in part on this concern. Third, many of the comments were made in 2002 and 2003 when Davis was first hired. Groszek resigned in 2008, approximately six years later. This is a large time gap. The Seventh Circuit has repeatedly held that temporally remote statements lack the requisite causal connection. *See* Defs. Mem. at 3 (citing Seventh Circuit cases). Six years is a long period to wait to carry out a plan which, according to Groszek, was hatched in 2002 when Davis was hired to be Chief. Groszek indirectly makes the same point in his response brief when he states that "[s]ix years is a significant length of time to employ an employee who is [allegedly] not meeting the employer's expectations." (Pl. Resp. at 6.) Moreover, during the six-year period, Groszek was promoted to sergeant. He also stated in his deposition that for the first two years after Davis and Rockett were hired he got along with them and that tension only emerged in 2004 when Groszek tried to switch his shift. (PF 9.)

More broadly, Groszek's deposition testimony, in several places, undercuts his discrimination claims. To succeed on his claims, Groszek must do more than show his supervisors were rude or unfair or even bad supervisors. This is because there are many non-discriminatory reasons why a supervisor and a subordinate may not get along, ranging from personality differences to conflicts over policies. Here, Groszek testified that he thought Davis had problems with *all* employees. *See* Groszek Dep. at 169 ("If you're going to want me to give an opinion on Chief Mark Davis, I don't think he likes anybody."). Asked to clarify whether his dislike centered on one race or gender, Groszek again suggested Davis was hostile to all employees. *Id.* ("I don't know who the man likes.") Groszek offered a similar assessment of assistant chief Rockett: "She believed that every day when she comes to work she should try to stick it to *every* cop she can." (*Id.* at 98; emphasis added.) These descriptions suggest Groszek felt Davis and Rockett treated everyone in a similarly unfair and rude manner. In addition, Groszek's deposition testimony also supports the view that the conflicts between Groszek and his supervisors were due at least in part to policy differences. For example, Rockett and Groszek clashed over how often officers should file written reports documenting problems. Groszek disliked this emphasis because, as he stated in his deposition, this approach did not fit with Groszek's own "vision of what a police officer is." (Groszek Dep. at 98.) These statements, when combined with the other undisputed evidence, undermine Groszek's reliance on circumstantial evidence to build a case of racial or age discrimination.

| STATEMENT |
|---|

    Aside from Groszek's reliance on the four statements, Groszek's only other argument is to assert that Davis "systematically promoted African-American employees while trying to force out or fire white employees." (Pl. Resp. at 4; PF 7.) The only support his offers to support this conclusion is to note that there were four white and no African American police sergeants when Davis began his job and that there were two white and two African American sergeants when Groszek resigned. We fail to see how this ratio (a 50/50 split between white and black sergeants) evidences discrimination against whites. Although Groszek somehow finds this 50/50 ratio to be "fishy" (Pl. Resp. at 5), this fact actually undermines his theory that Davis was targeting *all four* white sergeants (*see* PF 7).

    Groszek's direct evidence for age discrimination is similar. Groszek relies on a vague comment made in 2002. Davis allegedly asked if senior officers would give up their jobs if the Village could come up with a buy-out offer. Again, as with the evidence on race animus, the comments are far removed in time as well as ambiguous and are also undermined by intervening events including his promotion in 2004.

    **Retaliation Claim.** To establish a prima facie case of retaliatory discrimination under the direct method, which is the method Groszek is relying upon, he must show "(1) that [he] engaged in an activity protected by Title VII; (2) that [he] suffered an adverse action taken by [the Village]; and (3) a causal connection between the two." *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009). The only factor at issue is the causal link. Groszek filed two EEOC complaints, one on January 8, 2008 and one on July 9, 2008. Groszek claims he was constructively discharged on October 20, 2008. The problem with Groszek's theory is that Davis clearly announced his decision to fire plaintiff in November 2007, well before he filed his EEOC complaints. Recognizing this problem, Groszek argues that the defendants "did not have to follow through with their intentions to terminate Plaintiff and only chose to do so after Plaintiff filed an EEOC complaint." (Pl. Resp. at 15.) But there is simply no evidence in the record that would suggest defendants had a change of heart about the decision to fire Groszek. His theory rests purely on conjecture -- one that goes against common sense. In essence, he is claiming (without any evidence) that Davis, without telling anyone, decided to reverse his earlier-stated decision to fire Groszek but before Davis could make this intention known publicly he reversed course a second time and decided to re-start the firing process because he wanted to retaliate against Groszek for filing the EEOC complaint in the interim. The much simpler explanation is that his decision was made before the EEOC complaints were filed and they had no bearing on his earlier decision. For the above reasons, we grant summary judgment to defendants on the retaliation claim.